Donald MENTZEL, Petitioner-Respondent,

v.

CITY OF OSHKOSH, Appellant.

Court of Appeals

*No. 87–1607. Argued August 24, 1988.—Decided October 12, 1988.*

(Also reported in 432 N.W.2d 609.)

On behalf on the defendant-appellant, their were briefs and oral argument by *John W. Pence,* city attorney, Oshkosh.

On behalf of the petitioner-respondent, their was a brief and oral argument by *Eugene A. Bartman,* of *Curtis-Wilde Law Offices* of Oshkosh.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

BROWN, P.J.   This is a review of a trial court's conclusion that an inverse condemnation occurred. The city of Oshkosh claims that it did not "take" Donald Mentzel's property, and that the trial court misread the law in deciding otherwise. We hold that the trial court's findings of fact are not clearly erroneous and that the court correctly applied the

805

law. We affirm the trial court's finding of inverse condemnation and assessment of attorney fees.

Pursuant to this court's order, the trial court on remand set forth detailed findings of fact and conclusions of law. Such findings are of particular importance in cases involving a taking. *Burrows v. City of Keene,* 432 A.2d 15, 20 (N.H. 1981). We therefore reproduce them in some detail.

Mentzel owns a building in the 100 block of North Main Street in downtown Oshkosh. At least from the mid-fifties, the property had been operated as a tavern. However, Mentzel himself never held a liquor license; he rented out the property to a series of tenants who obtained licenses and operated the premises as a tavern. In 1985, the city notified Mentzel that his property was in a designated redevelopment area. At that time, Mentzel received information from the city related to his property, including his rights as a landowner under condemnation proceedings.

In April of 1986, Mentzel was told by the city that he should repair a wall on his property. City officials also discussed with him the purchase of his property. No deal was struck.

In the summer of 1986, Mentzel received a raze or repair order from the city, which cited the dilapidated wall. At about the same time, the city negotiated with Mentzel's tenants a surrender of the liquor license in exchange for an agreement not to prosecute a complaint against the tenants. Mentzel was advised by the tenants that they had been offered relocation payments by the city before the license was surrendered.

On the same day that the license was surrendered, Mentzel applied for a license. He was unsuccessful. He subsequently reapplied and was again denied. Never before had a liquor license been denied

to the owner or operator of this particular property. City council members informed Mentzel that the license was denied because the city planned to acquire the property.

Expert testimony established that denial of a liquor license rendered the property economically worthless, especially given the historical use of the property as a tavern. Hence, it was economically not feasible for Mentzel to repair the wall; he would have no way to recoup his investment.

The city has acquired other properties in the North Main Street area. Its intent to acquire property in the redevelopment area is a matter of public record. The trial court's final finding of fact was that the city's actions as to Mentzel's property were taken for the purpose of affecting the relative bargaining positions of Mentzel and the city. As a matter of law, it concluded that the city's actions constituted a taking by the city of Mentzel's property.

We address first the proper standard of review. An inverse condemnation action may be pursued when the condemnor's actions amount to a taking even though the condemnor has failed to exercise its condemnation powers. *Maxey v. Redevelopment Auth. of Racine,* 94 Wis. 2d 375, 387, 288 N.W.2d 794, 799 (1980). These actions must be in the form of a legal restraint imposed by the condemning authority. *Howell Plaza, Inc. v. State Highway Comm'n,* 92 Wis. 2d 74, 88, 284 N.W.2d 887, 893 (1979). The legal restriction must practically or substantially render the land useless for all reasonable purposes. *Id.* at 85, 284 N.W.2d at 892.

Whether a property owner has been deprived of substantially all of the beneficial use of the property is a question of law. *Id.* at 80, 284 N.W.2d at 889. When reviewing questions of law, we owe no deference to the trial court. *Katze v. Randolph & Scott Mut. Fire Ins. Co.,* 111 Wis. 2d 326, 330, 330 N.W.2d 232, 234 (Ct. App. 1983), *rev'd on other grounds,* 116 Wis. 2d 206, 341 N.W.2d 689 (1984).

Even though we are ultimately dealing with a question of law, we note that the parties dispute certain facts and the inferences drawn from the facts. That being the case, we observe that we are really dealing with a mixed question of fact and law—requiring findings as to what happened and a conclusion as to the legal significance of those facts. Findings of fact made by a trial court sitting without a jury shall not be set aside unless they are clearly erroneous. Sec. 805.17(2), Stats. When more than one inference can be drawn from the credible evidence, the reviewing court must accept the inference drawn by the trier of fact. *Cogswell v. Robertshaw Controls Co.,* 87 Wis. 2d 243, 250, 274 N.W.2d 647, 650 (1979). The appellate court will search the record for evidence to support the trial court's findings of fact. *In re Estate of Becker,* 76 Wis. 2d 336, 347, 251 N.W.2d 431, 435 (1977).

The trial court found that inverse condemnation had taken place because of the effect of actions taken by the city upon the property. These actions consisted of denial of a liquor license to Mentzel and a raze or repair order on the property. The trial court accepted the testimony of Mentzel's expert witness and determined that Mentzel's property had only one reason-

able use—as a tavern. Such testimony is credible in view of the record as a whole. The inside of the building was modeled as a tavern. The building could be remodeled to fit another purpose only at great expense to Mentzel. Even if remodeled to suit another purpose, it would only be used to house a small retail store like a shoe store, a store selling specialty clothes, or something similar. The building had only 1200 to 1300 square feet of usable space. Yet, downtown Oshkosh has many vacancies for small retail operations. Because the supply of available space far outstrips the demand for such space, the rents for these small stores are low. Therefore, the cost of remodeling would be much greater than the rental obtained. The result would be an economic disaster for Mentzel were he to remodel the building. The trial court's conclusion that the only reasonable use would be as a tavern is sustained.

The trial court then concluded that denial of the liquor license and issuing the raze or repair order, considered within the totality of the circumstances, "demonstrate that the city's actions were taken for the purpose of affecting the relative bargaining positions of the parties." The totality considered also included: appraisal of the property, notification to Mentzel of his condemnation rights, attempts to negotiate a purchase from Mentzel of the property, and negotiating the surrender by Mentzel's tenants of the liquor license.

The city disputes the conclusion, arguing that "intent" is irrelevant to the analysis of what constitutes a taking. The city asserts that the licensing denial and the raze or repair order are exercises of the police power that rest within the government's discretion. The city then asserts that the denial of the

license and the issuance of the raze or repair order had nothing whatsoever to do with the redevelopment project and that the latter is separate from and coincidental to the city orders of which Mentzel complains.

Intent to use a legal restriction to effectuate a taking is not a prerequisite for finding that a taking has occurred. In *Zinn v. State,* 112 Wis. 2d 417, 430, 334 N.W.2d 67, 73 (1983), our supreme court quoted the United States Supreme Court with approval. It wrote:

> It is well established that "'the constitution measures a taking of property not by what a state says, or by what it intends, but by what it *does.'*" *San Diego,* 450 U.S. at 652–53, (Brennan, J. dissenting), quoting *Hughes v. Washington,* 389 U.S. 290, 298 (1967) (Stewart, J., concurring). It is the *effect* of the state's action that triggers the Just Compensation Clause, not the intent of the government in taking the action which led to the deprivation of private property rights. If government action has the effect of taking private property for public use, just compensation must be made. Decisions of this court make it clear that the intent of the government has never been the test, rather we look to whether the impact on the property owner was to deprive him or her of substantially all beneficial use of the property or render the land useless for all reasonable purposes. [Emphasis in original.]

But while intent does not determine a taking absent the necessary impact, the purpose of governmental action is a relevant subject of inquiry. *See, e.g., State v. Herwig,* 17 Wis. 2d 442, 450, 117 N.W.2d 335, 339–40 (1962) (*"Both the purpose and the effect* of

Rule, sec. WCD 11.06(6)(a), 1 Wis. Adm. Code, were to utilize the defendant's farmland for the support of wildfowl as well as to protect the wildfowl from hunting. In the stipulation of facts, *the purpose of the closed-area device* is described as including a place where the wildfowl will 'stop for awhile and rest and feed.'") (emphasis added); *see also Burrows,* 432 A.2d at 20 ("The purpose of the regulation is an element to be considered.").

Here, the trial court found that the purpose of the city's actions in negotiating the license surrender with Mentzel's tenants, denying Mentzel a license, and issuing the raze or repair order, was to manipulate the market value of Mentzel's property, in the city's favor. Further, it found that the city planned to acquire Mentzel's property. The impact of the city's actions, as found by the trial court, was a complete loss to Mentzel of all viable economic use of his property.

Following similar findings of fact, our supreme court found a taking in *Maxey v. Redevelopment Auth. of Racine,* 94 Wis. 2d 375, 288 N.W.2d 794 (1980). The facts chosen as relevant by the *Maxey* court are as follows.

Defendant, a governmental agency, negotiated a purchase of property with some of those who held an ownership interest in it. The agency was unable to reach agreement with all interested parties; Maxey, the lessor of a theater operator, rejected their offer. Meanwhile, the city council denied Maxey a renewal of a theater license pursuant to a newly-enacted moratorium on such licenses. City agents contacted tenants in the building and encouraged or caused them to vacate. The city again made an offer to Maxey, who again declined and instead instituted an action for inverse condemnation.

The court found denial of the license resulted in a complete loss to Maxey of all beneficial use of the property. Bolstered by evidence of the purpose behind the agency's actions, the court found a taking.

> While we conclude that the failure to renew the theater license in itself supports the finding of a taking, the City additionally stipulated that ... it contacted the tenants in the building and encouraged or caused them to vacate, and that it made statements to the press that the building "would" be taken through eminent domain proceedings. The City's conduct went beyond mere notification of a possible taking. The City caused the tenants to vacate and stated the property "would" be taken.

*Maxey* at 391–92, 288 N.W.2d at 802.

The city attempts to distinguish the instant case from *Maxey*. It argues that while in *Maxey*, revocation of the theater license was for the purpose of obtaining the property, here, denial of the license and other city actions were taken to effect legitimate city goals: well-maintained buildings and law-abiding tavern businesses.

The distinction does not exist, however, under the facts as found by the trial court. The court found evidence of the city's intent to obtain the property. It also found that the city's actions were taken for the purpose of affecting property values: in this case, driving down the value of Mentzel's property. This purpose also directed the governmental actions in the *Maxey* case.

A similar question to that posed here is addressed in *San Antonio River Auth. v. Garrett Bros.*, 528 S.W.2d 266 (Tex. Ct. App. 1975). "The question before us is whether prohibitions on use of property which

have as their purpose the prevention of private development that would increase the cost of planned future acquisition of such property by the government is the type of case in which payment of compensation is required." *Id.* at 273. That court answered affirmatively; and as its reasoning is particularly *apropos,* we set it forth here:

> When government, in its role as neutral arbiter, adopts measures for the protection of the public health, safety, morals or welfare, and such regulations result in economic loss to a citizen, a rule shielding the agency from liability for such loss can be persuasively defended, since the threat of liability in such cases could well have the effect of deterring the adoption of measures necessary for the attainment of proper police power objectives, with the result that only completely safe, and probably ineffective, regulatory measures would be adopted. But where the purpose of the governmental action is the prevention of development of land that would increase the cost of a planned future acquisition of such land by government, the situation is patently different. Where government acts in this context, it can no longer pretend to be acting as a neutral arbiter. It is no longer an impartial weigher of the merits of competing interests among its citizens. Instead, it has placed a heavy governmental thumb on the scales to insure that in the forthcoming dispute between it and one, or more, of its citizens, the scales will tip in its own favor ....
>
> To hold a governmental agency liable under [these] facts ... will not cause the heavens to fall.... The only result will be that it will not be able to "rig" the market in its favor. That is, government will merely be discouraged from giving itself, under the guise of governing, an econom-

813

ic advantage over those whom it is pretending to govern.

*Id.* at 274.

*Maxey* teaches that in Wisconsin, the value of land is not assessed in a vacuum. It includes a reflection of the highest and best economic use of a particular structure in a particular area. When a government entity, seeking a different use for the land, prevents the owner from making any economically feasible use of the land, a taking can be found.

Similarly, the New Hampshire Supreme Court found a taking when, following the city's unsuccessful attempt to purchase plaintiff's land at less than its economic value, it rezoned plaintiff's property to preclude planned development. That court reasoned as follows:

> From the outset, it was plain that the city wished that the plaintiffs' land be devoted to open space.... The city, however, would not pay a reasonable price for the property, electing instead to offer to purchase the property for a sum representing the land's value based on the city's intended use of the land rather than the price to which the plaintiffs were entitled, *which was one reflecting its highest and best use....*
>
> Instead of acquiring the plaintiffs' land by paying just compensation as required by [the New Hampshire] constitution, however, the city, when it found that it was unable to acquire it for little more than half its value, elected to accomplish its purpose by regulating the use of the property so as to prohibit all "normal private development." It is plain that the city and its officials were attempting to obtain for the public the benefit of having this land remain undeveloped as open space without

paying for that benefit in the constitutional manner.... The trial court found ... that the uses permitted were "so restrictive as to be economically impracticable, resulting in a substantial reduction in the value of the land" and that they prevented a private owner from enjoying "any worthwhile rights or benefits in the land."

....

The purpose of the regulation is clearly to give the public the benefit of preserving the plaintiffs' land as open space.

*Burrows,* 432 A.2d at 21 (emphasis added).

*Maxey* teaches that governmental purpose can be learned from the actions of its agents, as well as from legislative and quasi-legislative actions such as the enactment of ordinances, rules and statutes. Hence, it was relevant in *Maxey* that city officials made statements to the press regarding the city's intent to take the property, and relevant that city agents encouraged tenants to vacate the coveted property. So too is it relevant here that city agents made it a matter of public record that they intended buying property in the redevelopment area, that they negotiated a buyout of Mentzel's tenants before they negotiated a license surrender, and that members of the city council informed Mentzel that he was denied a liquor license because the city wanted his land.

█

Considering all the facts and circumstances, the trial court determined that the city's actions regarding the liquor license and that timing of the raze or repair order during the negotiation stage for the land was a taking. The trial court found that the city intended to impact upon the negotiation process. And in fact, the impact of the city's actions during the

beginning stages of the eminent domain were then found to have upset the balance in bargaining. The ultimate result was a taking: a complete loss to Mentzel of the beneficial use of his property. While we might have made different findings of fact based upon the historical facts presented, such is not our standard of review. Rather, we may only decide whether the trial court's determination is clearly erroneous. It is not.[1]

The result requested by the city might well be cost efficient for it, but the consequence is a reduction in the appraisal of the property. It is an inefficient transfer of land because the compensation is not equal to the opportunity costs of the land seized. The maximum benefit is to the city which is able to largely avoid both the market place of negotiation or the consequences of a normal eminent domain action. In return, there is no benefit to Mentzel. The intent and spirit of sec. 32.10, Stats., forbids that eventuality.

*By the Court.*—Order affirmed.

---

[1]At oral argument, counsel for the city took issue with several of the trial court's findings of fact. Specifically, the city argued that: (1) Mentzel's property at one point had been used as residential housing and therefore could be so used again; and (2) evidence of the city's negotiation with the tenants regarding surrender of the liquor license, the evidence of the city council's motives in denying Mentzel a license, and the evidence of relocation payments offered to the tenants was all hearsay.

The city's arguments concerning the findings of fact are well taken. Nonetheless, the record contains unobjected to testimony from which a factfinder could draw the conclusions reached by the trial court. Given the record made, our standard of review compels a determination that the court's findings of fact are not clearly erroneous.